UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

IN RE                              )
                                   )
PTM Technologies, Inc.,            )   Case No. 10-50980C-11W
                                   )
       Debtor.                     )
                                   )

MEMORANDUM OPINION

This case came before the court on February 26, 2013, for a confirmation hearing on the Debtor's Modified Plan dated August 31, 2012 and modified November 12, 2012 (Docket #414) ("the Debtor's Plan"), and the Third Amended Chapter 11 Plan Filed by General Electric Capital Corporation ("GE Capital") dated November 14, 2012 and modified November 27, 2012 (Docket #422) ("the GE Plan"). Charles M. Ivey, III appeared as attorney for the Debtor; John A. Northen appeared as special counsel for Peter L. Tourtellot, the Chapter 11 Trustee for Renegade Holdings, Inc., Alternative Brands, Inc. and Renegade Tobacco Co, Inc.; Alexander Terras and Rebecca A. Leigh appeared on behalf of GE Capital; Paul A. Fanning appeared on behalf of Bank of the Carolinas; James C. Lanik appeared on behalf of Seacap Leasing Associates, successor to Maxus Capital Group; and Robyn C. Whitman appeared on behalf of the United States Bankruptcy Attorney. Having considered the Plans, the objections to the Plans, the evidence offered at the hearing, the matters of record in this case, and the arguments of counsel, the court makes the following findings of fact and conclusions of law pursuant to Rule 9014 and 7052 of the Federal Rules of Bankruptcy Procedure.

JURISDICTION

This court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and Local Rule 83.11 of the United States District Court for the Middle District of North Carolina. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(L) which this court may hear and determine.

FACTS

1. The Debtor

The Debtor, PTM Technologies, is a wholly owned subsidiary of Renegade Holdings, Inc. ("RHI"). RHI and its subsidiaries are fabricators and distributors of tobacco products consisting primarily of cigarettes and cigars. RHI owns three other wholly owned subsidiaries besides the Debtor: Alternative Brands, Inc. ("ABI"), Renegade Tobacco Co., Inc. ("RTC"), and Dogwood Winery and Vineyards ("DWV").[1] The stock of RHI is owned by Compliant Tobacco Company, LLC ("Compliant"), which is wholly owned by Calvin A. Phelps.

The Debtor owns cigarette manufacturing and processing equipment which it leases to ABI. The Debtor's primary assets consist of cash, rights to payment, and its cigarette manufacturing

---

[1] RHI, ABI, and RTC ("the Renegade Debtors") filed voluntary petitions in this court seeking relief under Chapter 11 of the Bankruptcy Code on January 28, 2009, and on February 12, 2009 the cases were consolidated for purposes of administration, case number 09-50140.

- 2 -

and processing equipment. Its only source of revenue is the lease of its equipment to ABI. The Debtor continued to lease its equipment to ABI following the commencement of this case.

2.  History of the Proceedings

The Debtor filed a proposed Disclosure Statement and Plan of Reorganization with the filing of its petition on May 26, 2010. The timing of the Debtor's filing came approximately three weeks following the court's confirmation of the Renegade Debtors' Plan on April 23, 2010. Thereafter, the Signatory States[2] sought reconsideration based on new information that Phelps and the Renegade Debtors were the subject of an ongoing criminal investigation by the United States Attorney for the Northern District of Mississippi for tobacco-related crimes, which had not been disclosed before confirmation of the Renegade Plan. The court determined that the existence of the ongoing criminal investigation was material information that should have been disclosed to creditors before they considered and voted to accept or reject the Prior Renegade Plan, and on July 13, 2010 vacated the order confirming the Plan. In response to a subsequent request filed by

---

[2] "Signatory States" refers to 51 of the 52 government jurisdictions that are signatories to the 1998 tobacco Master Settlement Agreement ("MSA"). The 52 jurisdictions include forty-six states of the United States (excluding Texas, Mississippi, Minnesota, and Florida), the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, American Samoa, and the Northern Marianas. The one MSA jurisdiction that is not included is Tennessee.

the Renegade Debtors for the appointment of a chief restructuring officer or trustee, the court appointed Peter L. Tourtellot as Chapter 11 Trustee for the Renegade Debtors. Following the rescission of the confirmation order in the Renegade case, the Renegade Debtors' original Plan of Reorganization was withdrawn and an Amended Joint Plan of Reorganization (amended on February 20, 2013) was filed. The Amended Joint Plan came before the court for confirmation hearing on April 17-18, 2013. On May 29, 2013, the court denied confirmation of the Amended Renegade Plan. The Renegade Debtors then filed a Motion for Private Sale of New Equity Interests to Globe 360 Tobacco, Inc. for $25,000,000, an amount sufficient to fully fund the Amended Joint Plan. That motion has since been withdrawn as a result of the prospective purchaser withdrawing its offer to purchase.

3. The ABI Equipment Lease and Administrative Claim

Following the commencement of this case, the Debtor and ABI entered negotiations concerning the appropriate lease rate for the equipment during the Chapter 11 case and thereafter. Because of the relationship between the Debtor and ABI, the Debtor consented to the appointment of an examiner, Walter W. Pitt, who was charged with, among other things, negotiating the terms of the equipment lease between the Debtor and ABI. In addition to ongoing rental payments, the Debtor contended that it had a claim for unpaid equipment rent that had accrued during the pendency of the Renegade

case. Mr. Pitt filed a cost of administration claim in the Renegade case in the amount of $785,125.32. The Trustee and the Renegade Debtors challenged the claim, asserting that certain pre-petition lease payments to the Debtor by ABI had exceeded a reasonable market rate and therefore were subject to avoidance pursuant to 11 U.S.C. § 548 as a fraudulent conveyance. The Debtor's plan proposes to settle this dispute by the allowance of an administrative expense claim in the Renegade case in the amount of $760,125.

4. Summary of the Debtor's Plan

The Debtor's Plan contemplates that the Debtor will continue in business following confirmation. Under the Plan, funds for the payment of creditors will be derived from three sources: funds on hand, payment of lease payments from the ABI Lease, and recovery of the PTM Administrative Expense Claim in the Renegade case. The Debtor's Plan adopts the lease agreement agreed to by the Debtor and ABI. Under the proposed terms, the lease is for a period of six years. During the first twelve months of the lease, the lease payment is $70,000 per month and increases to $95,000 per month during months thirteen through month seventy-two. The Plan further contemplates the appointment of a Plan Administrator with authority to collect and distribute proceeds and enforce the ABI Lease. A Plan Committee will be formed only upon the removal, death, or incapacity of the Plan Administrator, or notification to creditors

of the default and failure to cure default of the Equipment Lease.

The Debtor's Plan classifies the claims of creditors and equity security into the following five classes:

Class 1 consists of the secured claim of Huntington Bank. This claim was previously paid in full pursuant to the court's June 27, 2012 order approving settlement of the claim in the amount of $367,713.95.

Class 2 consists of all government entities who are owed priority tax claims under 11 U.S.C. § 507(a)(8). Under the Plan, these claims will be paid in cash, in full from available cash as generated on the Effective Date of the Plan or immediately following the entry of a final order liquidating and allowing the priority tax claim.

Class 3 consists of the guaranty claim held by Bank of the Carolinas ("BofC"). BofC holds a secured claim in the Renegade Debtors' proceeding, secured by assets in that proceeding. Under the Renegade Debtors' plan, the guaranty debt is scheduled to be paid in full. If the claim is not paid under the Renegade Plan, the Debtor's Plan provides that the claim shall be set in the amount of $300,000 as an allowed unsecured claim recognized under Class 4 of the Plan.

Class 4 consists of general unsecured claims. Under the Plan, all general unsecured claims shall be paid in full over a period of six years on a pro rata basis from funds received under the

Equipment Lease, and following confirmation will bear interest at an annual rate of 5.25 percent until paid in full. The Debtor anticipates that the funds received from the Equipment Lease will be insufficient to pay all Allowed General Unsecured creditor Claims in full after six years; therefore, the final payment to be paid by the post-confirmation Debtor shall equal the amount which is required to pay off the claims in full.

Class 5 consists of equity interests in the Debtor. This class shall receive no distribution under the Plan. After payment in full of all claims, all rights of corporate governance shall be restored to the existing ownership interests. Under the Plan, if Classes 1 through 4 have been paid in full with interest and funds remain, the Plan Administrator shall turn over the funds to holders of Class 5 Interests.

5.  Summary of Voting on the Debtor's Plan

The only claimant voting against the Debtor's Plan was GE Capital who filed a negative vote in Class 4. As a result of the GE ballot, the Plan was rejected by that class because the size of the GE Claim prevented compliance with the requirement under section 1126(c) that acceptance by at least two-thirds of the amount of the claims in a class is required in order to have acceptance by that class. The Plan was accepted by all other classes except for Class 1, which was deemed to have rejected the Plan as a result of no ballot having been filed.

6.  Seacap Leasing's Objection to Confirmation of the Debtor's Plan

Seacap Leasing, successor to Maxus Capital, has objected to the Debtor's Plan on the grounds that it is not in the best interest of creditors as required by section 1129(a)(7), and that the Plan fails to meet the requirements of section 1129(b) in that the Plan is not fair and equitable with respect to Class 4.

7.  GE Capital's Objection to Confirmation of the Debtor's Plan

GE Capital holds a claim in the amount of $5,046,953 based on GE Capital having refinanced indebtedness that was incurred by the Debtor for the purchase of various equipment and machinery. GE has objected to the confirmation of the Debtor's plan on the basis that the Debtor's Plan is not in the best interest of creditors. GE further contends that the Debtor's plan is not fair and equitable with regard to Class 4 claims because it omits the accrual and payment of interest on unsecured claims during the pendency of the bankruptcy case. Additionally, GE asserts that the Debtor's Plan violates the absolute priority rule because it allows equity interest holders to retain their interests in the reorganized Debtor while paying unsecured creditors less than their contractual right to payment. Finally, GE asserts that the Debtor's Plan is not proposed in good faith.

8.  Summary of the GE Plan

GE proposed a competing Plan of Reorganization which differs from the Debtor's plan in four significant ways. First, the GE

Plan categorizes the unsecured claim of Carolina Bank into a separate class from the other unsecured claims. Second, the GE Plan provides general unsecured creditors post petition interest at the rate of four percent per annum from the petition date until the effective date of the Plan. Third, the GE Plan provides accrual and payment of post-confirmation interest from the effective date of the Plan forward at the rate of seven percent per annum, compared to 5.25 percent under the Debtor's Plan. Finally, the GE Plan provides for the immediate appointment of a Plan Committee, and gives the Committee substantial authority over the day-to-day operations of the post-confirmation Debtor.

The GE Plan classifies the claims of creditors and equity security holders into the following six classes:

Class 1 consists of the secured claim of Huntington Bank. Under the GE Plan, the claim is deemed satisfied in full as a result of having been paid pursuant to an order of the court.

Class 2 consists of all unsecured priority claims. Under the GE Plan, if any such claims exist, they will be paid in full on the Effective Date of the Plan, with interest from the Petition Date to the Effective Date paid at the rate of four percent per annum.

Class 3 consists only of the unsecured claim of Carolina Bank. Under the GE Plan, Class 3 claims allowed as of the date of the Plan will accrue interest from the Petition Date to the Effective Date at the rate of four percent per annum, and from and after the

Effective Date at the rate of seven percent per annum over the course of the Plan. Class 3 claim holders may elect to serve on the Plan Committee.

Class 4 consists of the unsecured claim of BofC. Under the GE Plan, Class 4 claims will be allowed in an amount not to exceed $300,000 and will accrue interest from the Petition Date to the Effective Date at the rate of four percent per annum, and from and after the Effective Date at the rate of seven percent per annum over the course of the Plan. BofC will be required to marshal its other collateral in favor of the other Creditors in the Debtor's case in order to satisfy its claim.

Class 5 consists of the other unsecured claims. The treatment for claims in Class 5 is the same as provided for Carolina Bank in Class 3. Under the GE Plan, the Class 5 creditors will receive payment of up to 100 percent of their allowed claim, plus interest accruing from the Petition Date to the Effective Date at the rate of four percent per annum, and from and after the Effective Date at the rate of seven percent per annum over the course of the Plan. Class 5 claim holders may elect to serve on the Plan Committee.

Class 6 consists of equity interests in the Debtor. Under the GE Plan, Class 6 claims will be disallowed and holders of the equity interest will receive no distributions. After payment in full of all claims, all rights of corporate governance shall be restored to the existing ownership interests.

9.  Summary of Voting on GE's Plan

Only Class 5 voted for the GE Plan. The Plan was rejected by all other classes.

10. The Renegade Trustee's Objection to Confirmation of the GE Plan

The Trustee, on behalf of RHI, submitted a ballot with respect to the Class 6 Equity Interests to reject the GE Plan. The Renegade Trustee objects to confirmation of the GE Plan on three grounds. First, the Trustee argues that the GE Plan cannot be confirmed because it improperly classifies separately the claim of Carolina Bank, the sole creditor in Class 3, from the other unsecured claims in Class 5. Second, the GE Plan provides that unsecured claims shall be paid post-petition interest in contravention of 11 U.S.C. § 506 because the Debtor is, and always has been, insolvent. Third, the Trustee argues that the GE Plan is not proposed in good faith because it deprives RHI, the Debtor's sole shareholder, of all rights of corporate governance.

11. The Debtor's Objection to Confirmation of the GE Plan

The Debtor's objection to Confirmation of the GE Plan echoes the arguments raised by the Trustee. The Debtor further adds that the authority delegated to the Plan Committee and Plan Administrator under the GE Plan will unduly interfere with the Reorganized Debtor's operations and substantially increase the cost of operations.

DISCUSSION

In deciding which of two competing Chapter 11 reorganization plans to confirm, the court must first determine whether one or more of the proposed plans is confirmable. To be confirmable, a reorganization plan must first meet all the requirements set forth in section 1129 of the Bankruptcy Code.

1.  The GE Plan is not confirmable

The GE Plan is not confirmable because it provides that allowed unsecured claims shall be paid post-petition interest from the Petition Date to the Effective Date. This provision is contrary to section 502(b)(2) and the GE Plan therefore does satisfy the requirement under section 1129(a)(1) that a plan must comply with the applicable provisions of Title 11.

Section 502(b)(2) prohibits the allowance of unmatured interest as part of an allowed unsecured claim. "It is well-established that when a debtor files for bankruptcy, the accrual of interest on its loans is suspended, and any subsequent claims brought by unsecured creditors for the amount of this 'unmatured interest' is prohibited under § 502(b)." In re W.R. Grace & Co., 475 B.R. 34, 159 (D. Del. 2012). See also In re United Artists Theater Co., 406 B.R. 643, 651 (Bankr. D. Del. 2009) ("payment of post-petition interest on pre-petition unsecured claims is prohibited.").

There are two exceptions to the general rule that would allow

creditors to proceed against the debtor for post-petition interest: (1) when a creditor is oversecured under 11 U.S.C. § 506(b); and (2) under section 726(a)(5), when the estate has sufficient funds on hand to pay the interest after having satisfied all other allowed claims. See Matter of Walsh Constr., Inc., 669 F.2d 1325, 1330 (9th Cir.1982) ("An award of post-petition interest may be allowed . . . where the alleged bankrupt proves solvent."); In re Boston & Maine Corp., 719 F.2d 493, 496 (1st Cir.1983) (same); Groundhog, Inc. v. San Joaquin Estates, Inc. (In re Joaquin Estates, Inc.), 64 B.R. 534, 536 (B.A.P. 9th Cir. 1986)(bankruptcy court abused its discretion in denying post-petition interest to unsecured creditor of solvent debtor in chapter 11 since interest would be paid under § 726); In re Gaines, 178 B.R. 101, 103 (Bankr. W.D. Va. 1995); In re Cardelucci, 285 F.3d 1232, 1234 (9th Cir. 2002); In re Dow Corning Corp. (Dow II), 244 B.R. 678, 692 (Bankr. E.D. Mich. 1999). Neither of these exceptions is applicable in this case.

GE's Plan relies on the solvent debtor exception to section 502(b)(2). GE argues that the Debtor is cash-flow solvent because of the Plan proposal to pay 100 percent of allowed claims. Therefore, GE asserts that in order to be confirmable, a plan of reorganization in the present case must pay post-petition interest. GE's argument follows from a flawed premise: the Bankruptcy Code defines insolvency using the balance sheet test, not cash flow.

The test for whether a debtor is solvent is whether the debts of such entity are less than its assets, at fair valuation. 11 U.S.C. § 101(32); <u>In re York</u>, Case No. 98-10153-C-11G (Bankr. M.D.N.C. April 30, 1999) ("[T]he test of whether the Debtor is solvent is whether his financial condition is such that the sum of his debts is greater than all of his property, at a fair valuation."). Because the Debtor is balance sheet insolvent, section 502(b)(2) prohibits the allowance of unmatured interest as part of an allowed unsecured claim. GE Capital's proposal to pay post-petition/pre-confirmation interest contravenes section 502(b)(2) and it Plan therefore does not comply with section 1129(a)(1).

GE's Plan also does not comply with section 1129(a)(1) because it violates section 1122(a) of the Bankruptcy Code. The violation of section 1122(a) results from the GE Plan classifying separately the claim of Carolina Bank (Class 3) from the other unsecured claims (Class 5). It was only through such separate classification that GE was able to meet the requirement under section 1129(a)(10) that a plan have at least one impaired class that accepts the plan. The inclusion of Carolina Bank in Class 5 with the other unsecured claims would have prevented GE from meeting the requirement under section 1126(c) that acceptance by more than one-half in number of the claims in the class is required in order to have acceptance by that class. Had Carolina Bank been included in Class 5, its negative vote would have meant that the vote of Class 5 was

fifty/fifty, and a resulting failure to comply with section 1129(a)(10).

"The main purpose of classification [of creditors] is to recognize a difference in rights of creditors which calls for a difference in treatment." In re Porcelli, 319 B.R. 8, 10 (Bankr. M.D. Fla. 2004). The proponent of a plan "has considerable discretion to classify claims and interests according to the facts and circumstances of the case," Olympia & York Florida Equity Corp. v. Bank of New York (In re Holywell Corp.), 913 F.2d 873, 880 (11th Cir. 1990), but bears the burden to demonstrate a justification for its classification scheme and that the classification is not motivated by the purpose of gerrymandering an affirmative vote of an impaired class. As a basis for the separate classification of Carolina Bank's unsecured claim, GE argues that unlike the Claims in Class 5, Carolina Bank has an "alternative avenue of recovery, allowing [Class 3] to potentially satisfy their claims without distributions from the Post Confirmation Debtor." Plan Proponent's Mem. Of Law (Docket # 510), p. 11. GE also argues that the Carolina Bank claim can be separately classified because it was disputed. Neither ground is a legitimate basis for separate classification in this case.

An examination of the Carolina Bank claim reflects that there was no legitimate basis for its separate classification. In July of 2008, Carolina Bank loaned Blue Ridge Airlines, LLC $1,893,744

for the purchase of an aircraft. The Debtor and Renegade Debtors guaranteed the loan. When Blue Ridge subsequently defaulted on the loan, and Carolina Bank repossessed and sold the aircraft and obtained a judgment for $1,465,577 against Blue Ridge for the deficiency that remained unpaid after the aircraft was sold. Carolina Bank asserted a general unsecured claim in the Renegade Case in the amount of $994,696.90, based upon the Renegade Debtors' guaranty of the Blue Ridge loan and a similar claim in this case based on the Debtor's guaranty. There were objections to the Carolina Bank claims by the Debtor and by the Renegade Debtors in their respective cases. On December 26, 2012, the court entered an order approving a settlement between Carolina Bank, the Renegade Debtors, and the Debtor in this case. Under the terms of the settlement, Carolina Bank has an allowed unsecured claim in the Renegade Case in the amount of $950,000 and a separate allowed unsecured claim in the amount of $300,000 in this case.

GE's claim that Carolina Bank has an "alternative avenue of recovery" misconstrues or ignores the nature of the settlement between Carolina Bank and the Debtor. At one time, other entities were jointly liable with the Debtor for the debt owed to Carolina Bank. As discussed above, however, the status of the Carolina Bank debt was altered by the terms of the settlement that was approved by the court. Under the settlement, Carolina Bank has an allowed unsecured claim in the Debtor's case in the amount of $300,000 and

a separate allowed unsecured claim in the Renegade Debtors' case in the amount of $950,000. Under the settlement, the claims are separate and independent of each other. The Debtor is not liable for the $950,000 claim that was allowed in the Renegade case and the Renegade Debtors are not liable for the $300,000 claim that was allowed in this case. Each of the claims represents an independent source of recovery. Contrary to the assertion by GE, satisfaction of Carolina Bank's claim in the Renegade case will not affect Carolina Bank's right because there is no "alternative avenue" that will or could alter the $300,000 claim of Carolina Bank in this case. The decisions cited by GE, which consider the separate classification of claimants where there is a third-party source of recovery are therefore inapposite. Whether or not Carolina Bank's claims are "satisfied" in the Renegade Case, Carolina Bank, like the other unsecured creditors in this case, is entitled to post-confirmation distributions from the Debtor and should have been included in the same class with them.

GE's second justification for segregation of Carolina Bank's claim is also without merit. The prevailing view of the court is that a claim may not be separately classified where the only basis for the separate classification is that the claim is disputed. Discrimination against disputed claims was specifically disapproved in the case In re ARN LTD. Ltd. P'ship, 140 B.R. 5 (Bankr. D.D.C. 1992), where the court concluded that the legal status of the

claim, not its disputed or undisputed status, was the proper focus of classification. See also In re Paolini, 312 B.R. 295 (Bankr. E.D. Va. 2004) (chapter 11 plan's classification of secured creditor's disputed unsecured claim of $6.3 million separately from undisputed unsecured claims was improper attempt to gerrymander voting process); In re Weiss-Wolf, Inc., 59 B.R. 653, 655 (Bankr. S.D.N.Y. 1986); In re Mastercraft Record Plating, Inc., 32 B.R. 106 (Bankr. S.D.N.Y. 1983), rev'd on other grounds, 39 B.R. 654 (S.D.N.Y.); In re Porcelli, 319 B.R. 8 (Bankr. M.D. Fla. 2004). Consistent with the foregoing decisions, this court believes that in evaluating whether the classification of a claim is proper, the court should consider the legal rights of the parties rather than the disputed nature of their claims at the time the plan proponent submitted its disclosure statement. Thus, to the extent that a dispute remains regarding the Carolina Bank claim, such disputed status is not a insufficient basis for the separate classification of the claim.

2. The Debtor's Plan is not confirmable

The Debtor's plan cannot be confirmed because it does not satisfy the feasibility requirement under section 1129(a)(11). The Debtor's Plan is dependent upon the Debtor entering into a lease of its equipment with Alternative Brands, Inc. It is undisputed that Alternative Brands, Inc. is not engaged in ongoing manufacturing and does not have the financial ability to make the payments that

would be required under the proposed lease. Without the proposed lease with Alternative Brands, Inc. the Debtor has no cash flow and no other means of making the payments proposed under the Plan and hence the Plan is not feasible. Feasibility under section 1129(a)(11) is a dispositive hurdle which, if not surmounted, precludes confirmation of a plan. <u>In re Olde Prairie Block Owner, LLC</u>, 467 B.R. 165, 169 (Bankr. N.D. Ill. 2012).

Based upon the foregoing findings and conclusions, the court has concluded that neither the GE Plan nor the Debtor's Plan should be confirmed. An order denying confirmation of both plans is being entered contemporaneously with the filing of this memorandum opinion.

This 26th day of August, 2013.

*/s/ William L. Stocks*
WILLIAM L. STOCKS
United States Bankruptcy Judge